IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of the Fort Hall Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, *et al.*, | ) ) | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. United States of America, *et al.*, | ) ) ) | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, *et al.*, | ) ) ) | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 05-2492 (JR) |
| Winnebago Tribe of Nebraska v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 05-2493 (JR) |
| Lower Brule Sioux Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 05-2495 (JR) |

|  |  |
|---|---|
| Prairie Band of Potawatomi Nation ) v. Kempthorne, *et al.*, ) | Civil Action No. 05-2496 (JR) |
| Te-Moak Tribe of Western Shoshone ) Indians v. Norton, *et al.*, ) | Civil Action No. 05-2500 (JR) |
| Cheyenne River Sioux Tribe ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-1897 (JR) |
| Stillaguamish Tribe of Indians ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-1898 (JR) |
| Iowa Tribe of Kansas and Nebraska ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-1899 (JR) |
| Confederated Tribes of the Goshute ) Reservation v. Kempthorne, *et al.*, ) | Civil Action No. 06-1902 (JR) |
| Muskogee (Creek) Nation of Oklahoma ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2161 (JR) |
| Eastern Shawnee Tribe of Oklahoma ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2162 (JR) |
| Northwestern Band of Shoshone ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2163 (JR) |
| Red Cliff Band of Lake Superior Indians ) Indians v. Kempthorne, *et al.*, ) | Civil Action No. 06-2164 (JR) |
| Pechanga Band of Luiseno Mission Indians ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2206 (JR) |
| Colorado River Indian Tribes ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2212 (JR) |
| Tohono O'Odham Nation ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2236 (JR) |
| Nez Perce Tribe, *et al.*, ) v. Kempthorne, *et al.*, ) | Civil Action No. 06-2239 (JR) |
| Passamaquoddy Tribe of Maine ) | Civil Action No. 06-2240 (JR) |

| | | |
|---|---|---|
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Salt River Pima-Maricopa Indian | ) | Civil Action No. 06-2241 (JR) |
| Community v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Coeur D'Alene Tribe v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2242 (JR) |
| | ) | |
| Ak-Chin Indian Community | ) | Civil Action No. 06-2245 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Sokaogon Chippewa Community | ) | Civil Action No. 06-2247 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Gila River Indian Community | ) | Civil Action No. 06-2249 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Northern Cheyenne Tribe of Indians | ) | Civil Action No. 06-2250 (JR) |
| v. Kempthorne, *et al.*, | ) | |
| | ) | |
| Haudenosaunee: The Onondaga Nation | ) | Civil Action No. 06-2254 (JR) |
| v. Kempthorne, *et al.*, | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR REMAND AND STAY OF LITIGATION**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Tribal Trust Accounts Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Types of Tribal Trust Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Interior Bureaus and Offices Responsible for Managing Current
            Tribal Trust Accounts and Providing Historical Accountings . . . . . . . . . . . . . 5

II.   History and Evolution of Tribal Trust Accounting at Interior . . . . . . . . . . . . . . . . . . . 5

      A.    Historical Policies and Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    The Tribal Reconciliation Project and the American Indian Trust
            Reform Management Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Congressional Response to the TRP and Subsequent Litigation . . . . . . . . . . . . 11

III.  Current Accounting Work at Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Accounting-Related Work of the Office of Historical Trust
            Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    Trust Reform Regulatory Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   Issues and Considerations to be Addressed to Complete the Accountings Owed to
      the Tribes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.    Relief Requested in Plaintiffs' Various Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.    THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE
      INTERIOR AND STAY THIS LITIGATION BASED ON APPLICATION OF
      THE PRIMARY JURISDICTION DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.    Preparation of an Historical Accounting Plan Raises Issues of Fact
            Not Within the Conventional Experience of Courts . . . . . . . . . . . . . . . . . . . . . 25

B.    Preparation of a Tribal Historical Accounting Plan Requires the
Expertise of Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.    Remand to Interior Appropriately Lessens the Potential for
Inconsistent Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

II.    THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE
INTERIOR AND STAY THIS LITIGATION BASED ON PRINCIPLES OF
ADMINISTRATIVE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

A.    This Court Should Exercise Its Clear Authority to Remand to
Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    Substantial and Legitimate Grounds Justify a Remand and
Stay of This Litigation to Permit Interior to Prepare a
Historical Accounting Plan for Tribal Trust Accounts . . . . . . . . . . . . . 30

2.    Remand is Appropriate to Allow Interior to Consider and
Incorporate Additional Evidence Related to Interior's
Accounting for Historical Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3.    Intervening Events Warrant Remand for
Completion of an Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Allnet Communications Service Inc. v. National Exchange Carrier Ass'n.*,
    965 F.2d 1118 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*American Ass'n of Cruise Passengers v. Cunard Line Ltd.*,
    31 F.3d 1184 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*American Indians Residing On Maricopa-Ak Chin Reservation v. U. S.*,
    667 F.2d 980 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Atchison, Topeka & Santa Fe. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) . . . . . . . . 27

*Brawner Building, Inc. v. Shehyn*, 442 F.2d 847 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . 23, 28

*Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28, 30, 33

*Ethyl Corp. v. Browner*, 989 F.2d 522 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Himmelman v. MCI Commc'n Corp.*, 104 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . 23, 24

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474 (8th Cir. 1988) . . . . . . . . . . . . 22

*Reiter v. Cooper*, 507 U.S. 258 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rohr Indus. Inc. v. Washington Metro. Area Transit Auth.*,
    720 F.2d 1319 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SBC Communications Inc. v. F.C.C.*, 138 F.3d 410 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 32

*SKF USA INC. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . 29, 30, 35

*Total Telecommunications Services, Inc. v. AT & T*,
    919 F. Supp. 472 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Western Pacific R.R.*, 352 U.S. 59 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FEDERAL STATUTES

25 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 U.S.C. § 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. § 4011(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

25 U.S.C. § 4043(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 U.S.C. § 4044 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 31, 35

25 U.S.C. §§ 155 & 161b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 U.S.C. §§ 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. §§ 162a(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25 U.S.C. §§ 4041-43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 U.S.C. §§ 461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

P.L. 103-412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. 100-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 100-446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 100-71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 101-121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 101-512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 102-154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 102-381 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 103-138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 103-332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. No. 107-153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 32, 36

Pub. L. No. 109-158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 32

## SUMMARY OF ARGUMENT

Defendants respectfully submit this Memorandum in support of their Motion for a Remand and Stay of Litigation.  In the thirty-seven tribal trust accounting cases pending before this Court, plaintiffs have asked this Court to order defendants to provide historical accountings of the tribes' trust funds and assets.  To the extent that the central focus of all these cases will necessarily be on providing historical tribal trust accountings, defendants request remand in these cases to the Department of the Interior ("Interior"), so that Interior can prepare and issue a plan setting forth the accountings to be prepared for all tribes including the scope and supporting rationale.  Defendant further requests that Interior be allowed six months from this Court's grant of remand to prepare and present the historical tribal accounting plan and that the cases be stayed while Interior prepares that plan.  As set forth in the accompanying declaration of Ross O. Swimmer, the Special Trustee for American Indians, devising such a plan requires the consideration of a host of complicated factual, technical, fiscal, legal and policy factors, more properly addressed by Interior in the first instance.  *See* Declaration of Ross O. Swimmer (hereinafter "Swimmer Decl.") (August 10, 2007).  Interior is committed to completing and issuing the historical tribal trust accounting plan during the remand period.  *Id.*

Defendants' remand request is rooted in the need to fully consider, among other things, (1) the application of the tribal accounting work-related expertise that the Office of Historical Trust Accounting ("OHTA") has developed since 2002; (2) the arguments that have been raised about the accounting duties and obligations owed to the tribes; and (3) the structure of the programmatic approach for resolving the tribal historical accountings.  Defendants request a remand based on the application of the primary jurisdiction doctrine, which allows for remand to

an agency to apply its expertise to coordinate administrative and judicial decisionmaking, and avoid inconsistent results.  As the agency to whom Congress has delegated authority for oversight and accounting of tribal trust accounts, Interior has developed certain substantial expertise in carrying out its responsibilities.  A programmatic approach to tribal trust accountings, such as the one that Interior intends to set forth in its historical tribal trust accounting plan, will most certainly reduce the potential for conflicting or competing demands on Interior.

Defendants further request a voluntary remand based on additional substantial and legitimate reasons; that is, to fully consider all factual, technical, fiscal, legal and policy concerns at issue as part of crafting a plan to address the requests for trust fund and non-monetary trust asset accountings made by tribes (including those in these thirty-seven cases).  As explained below, Congress delegated responsibility for tribal trust accounting to Interior; Congress directed Interior to undertake work to resolve disputes with tribes over the previous accounting-related products provided to tribes; and a remand will allow Interior to apply its insights gained from its accounting-related work to date, as well as to consider lessons learned from intervening events.  Moreover, as Interior has not yet set forth its programmatic historical trust accounting plan to guide all tribal trust accountings, the appropriate record for judicial review is presently incomplete.  Remand to the agency will benefit this Court's review by allowing for a complete record.

As also set forth in the supporting Declaration of Ross O. Swimmer, over the past several years, Interior has focused its efforts related to tribal accounting to addressing specific accounting issues raised by those tribes that had filed litigation prior to December 2006.  *See*

Swimmer Decl. ¶ 16.  As most of those tribal plaintiffs expressed an interest in pursuing

resolution of their accounting claims in Alternative Dispute Resolution ("ADR") or other direct

negotiations, Interior at that time sought to resolve accounting disputes on a case-by-case and

tribe-by-tribe basis, while it investigated and developed measures that might be more broadly

acceptable to all tribes.  This approach has resulted in Interior's collection and analysis of a large

body of information and data applicable to tribal accounting issues.  Given the present posture of

the thirty-seven tribal trust cases before this Court, however, a different approach that addresses

all of the tribes' accounting demands is required.  Accordingly, defendants request a brief six

month remand period to allow it to analyze and apply its existing body of accounting work, and

to articulate its proposed programmatic approach to resolution of plaintiffs' requests for

accountings.

**STATEMENT OF FACTS**

**I.      Tribal Trust Accounts Overview.**

The United States began holding money in trust for tribes in the early nineteenth century

and currently holds money and lands in trust for American Indian Tribes as specified in federal

treaties, statutes, regulations, and Executive Orders.  *See, e.g.,* Title 25 U.S.C. Chapter 4,

Performance by United States of Obligations to Indians.  The number of tribal trust fund

accounts under Interior's management has grown over time as a result of events such as

agreements between the federal government and tribes, and legislation.  *See* Swimmer Decl. ¶ 4.

Interior currently maintains approximately 1,450 tribal trust fund accounts for over 300

different tribal entities.  *Id.* ¶ 25.  As of September 30, 2006, the United States held over $2.9

billion on behalf of tribes.  *Id.*

3

A.    **Types of Tribal Trust Funds.**

The two most common kinds of tribal trust fund accounts are "proceeds of labor" accounts and judgment or award accounts.  *Id.* ¶ 4.  "Proceeds of labor" accounts relate to revenue generated from activities that tribes authorize to occur on tribal lands, such as oil and gas development, farming and grazing.  *See* 25 U.S.C. §§ 155 & 161b.  Judgment or award accounts consist of judgments or awards that tribes have received from federal courts and Congress for past use or alleged misuse of tribal assets.[1]  *See* 25 U.S.C. § 1401.  In addition, certain accounts for tribes were previously also maintained as Individual Indian Money (IIM) accounts.  *See* Swimmer Decl. ¶ 4.  These accounts, sometimes called voluntary deposit accounts or tribal IIM accounts, were established for a variety of purposes, e.g., revolving loan funds, tribal enterprises (such as timber mill operations), and income from tribes' undivided interests in allotted lands.  *Id.*  Key differences exist between tribal trust fund accounts and IIM accounts.  For example, the tribal trust fund accounts are not pooled for investment purposes, as are the IIM accounts.  *Id.*  Also, tribal trust fund account disbursements are handled differently and normally require different types of authorization including but not limited to tribal council actions.  *Id.*

---

[1]  In 1946, Congress established the Indian Claims Commission (ICC) to settle all tribal claims against the Government which existed prior to August 13, 1946.  *See* Indian Claims Commission Act of 1946 § 12, 60 Stat. 1049.  Tribes were given until August 13, 1951 to file claims before the Commission or they were deemed to have waived their historic claims.  *Id.*  Congress included claims against the United States for accountings as well as mismanagement of tribal trust funds within the jurisdiction of the ICC.  *Id.* § 2.

**B.      Interior Bureaus and Offices Responsible for Managing Current Tribal Trust Accounts and Providing Historical Accountings**.

In 1994, Congress created the Office of the Special Trustee for American Indians ("OST") and charged the Special Trustee with the responsibility of ensuring that Interior properly reform its measures for discharging its trust fund management and associated duties. *See* 25 U.S.C. §§ 4041-43.  In particular, Congress tasked the Special Trustee with overseeing a "fair and accurate accounting" of the trust accounts.  *See* 25 U.S.C. § 4043(b)(2)(A).  In 1996, the Secretary of the Interior transferred certain responsibilities for managing and administering Interior's trust funds from the Bureau of Indian Affairs (BIA) to OST, by Secretarial Order.  *See* Swimmer Decl. ¶ 10.  In 2001, the Secretary established the OHTA and charged it with the responsibility of planning, organizing, directing and executing the historical accounting for IIM account holders.  *Id.*  In July 2002, the Secretary amended the Order to expand OHTA's responsibility to include tribal historical accountings.  *Id.* ¶ 15.  As of June 25, 2007, OHTA performs historical accounting work under the direction of the Special Trustee.  *Id.*

**II.     History and Evolution of Tribal Trust Accounting at Interior.**

**A.      Historical Policies and Practices.**

Over the years, Interior has developed and implemented its own policies, regulations, specialized business systems and forms for handling funds and maintaining and reporting its records of account.  *See* Swimmer Decl. ¶ 5.  Prior to 1951, each BIA Agency Office (typically located on Indian reservations) accounted for financial activity using handwritten ledgers and journals.  *Id.*  In the early 1950s, Interior installed a more centralized accounting system in BIA Area (regional) Offices.  *Id.*  All fund types – Individual Indian Money ("IIM") as well as tribal – were integrated into this system.  *Id.*  Beginning in 1965, BIA began further centralizing its

accounting functions on a mainframe computer in Albuquerque, New Mexico. *Id.* The conversion to a computer system was completed in the late 1960s. *Id.* A new automated accounting system was developed and implemented in 1968 and modified in 1974. *Id.* The earliest date for which Interior now has electronic account and transaction data available is July 1, 1972 (the "Tribal Electronic Ledger Era"). *Id.* Interior utilized this system, known as the Trust Funds Management System ("TFMS"), until OST converted to the Omnitrust system for tribal trust fund accounts in April 1995. *Id.*

With regard to reporting account balances, historically Interior prepared and distributed to tribes periodic reports, which provided information on beginning and ending balances, along with receipts and disbursements. *Id.* ¶ 6. As another example of the historical reporting of trust fund information, specific information about tribal trust fund accounts was also reported until the early 1970s in Treasury's Combined Statement of Receipts, Expenditures and Balances of the United States Government (Combined Statement), a published report submitted annually to Congress. *Id.*

**B.    The Tribal Reconciliation Project and the American Indian Trust Reform Management Act.**

In the late 1980s, Interior focused on improving its accounting for tribal trust funds following several critical reports and investigated the feasibility of transferring certain money management responsibilities for Indian trust funds to a private bank. *See* Indian Trust Funds; Consultation Process to Procure Collection, Accounting, Advisory Investment Services and Custodial Services, 52 Fed. Reg. 12,348-49 (April 15, 1987). In response to Indian Country's concerns about the transfer of trust fund management to third parties, in a supplemental appropriation for Interior in 1987, Congress prohibited Interior from transferring any funds to

6

any third party management until "the funds held in trust for such tribe . . . have been audited and reconciled, and the tribe . . . has been provided with an accounting of such funds . . .." Act of July 11, 1987, Pub. L. 100-71, 101 Stat. 391, 416 (1987). Substantially identical provisions were contained in the appropriation acts for the next two fiscal years. *See* Act of December 22, 1987, Pub. L. 100-202, 101 Stat. 1329-214, 1329-229 (1987); Act of September 27, 1988, Pub. L. 100-446, 102 Stat. 1774, 1794 (1988).

By 1989, Congress was aware of some of the practical difficulties associated with conducting a wide-scale retrospective reconciliation of the trust fund accounts. Accordingly, the 1990 fiscal year appropriations legislation carried a modified version of the previous language which recognized the impracticability of reconciliation. *See* Act of October 23, 1989, Pub. L. 101-121, 103 Stat. 701, 714 (1989) (changing the language to prohibit any transfer until the funds have been "audited and reconciled to the earliest possible date, [and] the results of such reconciliation have been certified by an independent party as the most complete reconciliation of such funds possible").[2]

In May 1991, BIA hired an accounting firm Arthur Andersen LLP ("Andersen") to conduct agreed-upon procedures for the tribal trust accounts. That work is commonly known as the Tribal Reconciliation Project ("TRP"). *See* Swimmer Decl. ¶ 7. Interior also consulted extensively with tribal groups, including what now is known as the Inter-Tribal Monitoring Association ("ITMA"), a national tribal consortium consisting of numerous federally-

---

[2] Similar provisions were included in the appropriations bills for 1991-1995. *See* Act of Nov. 5, 1990, Pub. L. 101-512, 104 Stat. 1915, 1929; Act of Nov. 13, 1991, Pub. L. 102-154, 105 Stat. 990, 1004; Act of Oct. 5, 1992, Pub. L. 102-381, 106 Stat. 1374, 1389; Act of Nov. 11, 1993, Pub. L. 103-138, 107 Stat. 1379, 1391; and Act of Sept. 30, 1994, Pub. L. 103-332, 108 Stat. 2499, 2511.

recognized tribes, concerning the procedures that Andersen would use. *Id.*

In 1994, Congress enacted the American Indian Trust Fund Management Reform Act of 1994, Pub .L. No. 103-412 (codified at 25 U.S.C. §§ 161a, 162a and 4001-4061) ("1994 Trust Fund Reform Act")). This law recognized the government's trust responsibility for Indian trust accounts, and identified some of Interior's trust duties in that regard. *See, e.g.,* 25 U.S.C. § 162a. Congress adopted yet another variation of the requirement contained in the prior years' appropriations bills that Interior reconcile tribal accounts. *See* 25 U.S.C. § 4044. Congress also directed Interior to conclude the TRP by a specific date. *Id.* Section 304 of the 1994 Trust Fund Reform Act required Interior to provide a report to Congress on the TRP, and added new requirements that the Secretary of the Interior consult with the Special Trustee on the TRP, reconcile tribal trust fund account balances as of September 30, 1995, and report to Congress by May 31, 1996. *See* 25 U.S.C. § 4044.

In early 1996, Interior provided the results of the TRP reports to tribes. *See* Swimmer Decl. ¶ 8. The information provided to tribes as part of the TRP generally included: (1) transaction by transaction account statements (receipts, interest earnings, disbursements, balances, etc.) for tribal trust fund accounts for the period from July 1, 1972 (Fiscal Year 1973), to September 30, 1995 (Fiscal Year 1995); (2) a report describing the procedures performed for the FY 1973 to FY 1992 period and the results thereof; and (3) electronic images of source documents[3] that supported certain FY 1973 to FY 1992 transactions. *Id.* ¶ 7.

---

[3]   Source documents are the various trust-fund related financial documents, including those related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections, and journal voucher), investment transactions (e.g., accounts distribution sheet and Treasury market securities purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher and schedule of payment). *See* Swimmer Decl. at ¶ 7, n.1.

In transmitting each reconciliation report to a tribe, Interior, as required by 25 U.S.C. § 4044 (2), also requested that the tribe complete and return an attestation form indicating whether it accepted or disputed the account balances, and explain any objections to the reported account balances.  *See* Swimmer Decl. ¶ 8; *see also* Declaration of Dawn M. Boswell (hereinafter "Boswell Decl.") at Attach. A (*Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Accounts* (Nov. 13, 1997) at 9).  Of the attestation responses received from the fifty-four tribes, who now have thirty-seven accounting cases pending before this Court, four of the Tribes accepted the accuracy of the balances provided to them:  the Gila River Indian Community, the Oneida Nation[4], the Northern Cheyenne and the Stillaguamish.  The other responses received from the tribes represented in the thirty-seven cases before this Court were distributed as follows: seventeen tribes disputed the results and ten tribes requested more time for review.  *Id.*  Twenty-one tribes never responded.[5]  *Id.*  On May 31, 1996, Interior provided a report on the TRP to Congress as required by the 1994 Trust Fund Reform Act.  *Id.*; *see also* Boswell Decl. at Attach. B (*Letters and Report from Bruce Babbitt, Secretary of the Interior to Hon. John McCain and Hon. Don Young* (May 31, 1996)).

During the TRP, Interior spent about $21 million for contract costs to locate supporting documentation, analyze historical trust transactions, and perform other reconciliation

---

[4] The Oneida Nation is part of the Haudenosaunee Confederation.  *See* Swimmer Decl. ¶ 8, n.2. There are five additional tribes under Haudenosaunee who sent separate responses *Id.* ¶ 8, n.3.

[5]  Of note the Wyandot Nation of Kansas and the Mohawk Nations did not receive a TRP.  The additional eleven named plaintiffs under the *Nez Perce* class action had their own responses. Passamaquoddy had two governing entities, of which only one responded.  *See* Swimmer Decl. at ¶ 8, n.3.

procedures to validate tribal account balances. *See* Boswell Decl. at Attach. A

*(Recommendations of the Secretary of Interior for Settlement of Disputed Tribal Trust Fund*

*Accounts* (Nov. 13, 1997) at 1). Following completion of the TRP, Interior attempted to resolve

the disputed tribal account balances of which it had been made aware. *See* Swimmer Decl. ¶ 9.

In part, this was done through consultations with tribes (including, but not limited to those with

accounting cases pending before this court). *Id.* Interior also continued to work to reconcile

even more of the non-investment transactions than had been completed within the

Congressional deadline set for the completion of the TRP. *Id.*

In accordance with the directive in the 1994 Trust Fund Reform Act to make efforts to

resolve any disputed tribal account balances, Interior submitted a legislative proposal for

resolving those disputes to Congress in December 1996. *See* Boswell Decl. at Attach. C

(Letters from Bruce Babbitt, Secretary of the Interior, to Hon. John McCain and Hon. Don

Young (Dec. 11, 1996), enclosing *Proposed Legislative Options in Response to Tribal Trust*

*Fund Reconciliation Project Results* (1996)). After tribal consultations, which led to significant

changes to the options set forth in Interior's December 1996 report, Interior again submitted its

recommendations to Congress in November 1997. *See Id.* at Attach. A (*Recommendations of*

*the Secretary of Interior for Settlement of Disputed Tribal Trust Fund Accounts* (Nov. 13, 1997)

at 9). A key feature of the legislative proposal Interior submitted to Congress was mandatory

mediation, *i.e.*, a tribe-by-tribe, Government-to-Government settlement process which would

take into account the specific circumstances and claims of each Tribe. *Id.* at 21-22.

Importantly, Interior contemplated that "[a]s part of the negotiations, there would be an

opportunity to obtain additional data or undertake additional analysis to the extent it would be

10

constructive in reaching a satisfactory resolution of claims." *Id.* In other words, Interior made

clear to Congress in 1997 that further accounting efforts were possible and also expressed that it

would pursue such accounting where appropriate in order to address the individual

circumstances of each tribe. *Id.* Congress held at least one hearing on the legislative proposal,

but took no further action on that legislation.

### C.        Congressional Response to the TRP and Subsequent Litigation.

It was not until 2002 that Congress passed additional legislation regarding the TRP.

Aware that some tribes were filing suits to preserve their objections to the TRP,[9] Congress

amended the 1994 Act to extend the date that tribes would be deemed to have received their

TRP reports. *See* An Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No.

107-153, 116 Stat. 79 (2002) (codified at 25 U.S.C. § 4404 note). This legislation essentially

deferred the deadline for tribes to object to the TRP by extending the statute of limitations until

December 31, 2005. Congress' expressly stated purpose in passing this legislation was to

encourage settlement negotiations between tribes and the United States. Congress noted that

the extension was to provide tribes with "the opportunity to postpone the filings of claims, or to

facilitate the voluntary dismissal of claims, to encourage settlement negotiations with the

United States." Pub. L. No. 107-153, § 1(b); *see also* Rep. No. 107-138. The extension also

allowed for the creation of a process to settle trust fund accounting claims. *See* 148 Cong. Rec.

H704-01 (Mar. 6, 2002) (statement of Rep. Hansen). In 2005, Congress extended, for an

additional year, the date on which tribes would be deemed to have received their TRP reports by

---

[9] There were 13 such cases pending before the Court of Federal Claims and this Court in April
2002.

another amendment to the 1994 Act.  *See* An Act to Amend Public Law 107-153 to Modify a

Certain Date, Pub. L. No. 109-158.[7]

## III.     Current Accounting Work at Interior

As stated above, the Secretary of the Interior transferred responsibility for trust funds

management from BIA to OST in 1996.  *See supra.*  Since the transfer, OST has been

performing what Interior thus terms the "current accounting" work for tribes.  *See* Swimmer

Decl. ¶ 13.  One important component of the current accounting work is the preparation and

delivery of periodic statements of performance, which are required by the 1994 Trust Fund

Reform Act to be sent quarterly to each tribe (although tribes may request more frequent

statements, and the majority of tribes are receiving monthly statements).  *Id.*  Statements of

performance include information on the types of receipts, income and disbursements, and

financial investment holdings including earnings, gains and losses.  *Id.*

Since April 1995, Interior has utilized two widely used, commercial trust management

systems to account for activity in tribal trust fund accounts, including financial asset holdings.

*Id.* ¶¶ 12, 14.  From 1995 to 1998, Interior used the Omnitrust system to report receipt,

disbursement and investment activity and holdings to the tribes.  *Id.*  In 1999, OST converted

tribal trust accounts into the Trust 3000 system, commonly referred to as the Trust Fund

Accounting System (TFAS).  *Id.* ¶ 14.  TFAS allows Interior to provide periodic statements of

performance.  *Id.*; *see also* 25 C.F.R. § 115.803.  Further, Interior's current reports to tribes also

---

[7]  The second extension provided in part:  "Notwithstanding any other provision of law, for purposes of determining the date on which an Indian tribe received a reconciliation report for purposes of applying a statute of limitations, any such report provided to or received by an Indian tribe . . . shall be deemed to have been received by the Indian tribe on December 31, 2000."

include detailed information about the investments held for each account.  *Id.* ¶ 14.

Another significant trust reform measure in the post-1994 period relates to the consolidation and safeguarding of Indian records.  To date, Interior has indexed and consolidated over 156,000 boxes of inactive Indian-related records, containing an estimated 392 million pages, at the American Indian Records Repository ("AIRR") in Lenexa, Kansas.[8]  *Id.* ¶ 11.  The AIRR is a national repository for American Indian records created in 2004 pursuant to a Memorandum of Understanding between Interior and the National Archives and Records Administration (NARA).  *Id.*  Well over half of these boxes contain records pertaining to trust funds and trust assets, while the remainder relate to other BIA programs (such as law enforcement, education and general administration).  *Id.*  A significant number of additional boxes of Indian-related records are retained at various other NARA Federal Record Centers and at National Archives such as that in Washington, D.C., as well as various Interior and Treasury offices across the country.  *Id.*

## A.     Accounting-Related Work of the Office of Historical Trust Accounting

Between 2002-06, OHTA's tribal work focused largely on the specific issues and questions raised by those tribes that filed cases prior to December 2006.  *Id.* ¶ 16.  Rather than proceed with active litigation, most of those tribes expressed a preference for working with Interior in the context of settlement negotiations (including ADR).  *Id.*  As part of this process, OHTA has provided briefings on the TRP to these and other tribes; examined the TRP Andersen work papers as well as related document collections; and prepared various accounting

---

[8] Inactive records are those that are no longer required for the agency's day-to-day activities and that have met the applicable schedule for retirement.  *See* Swimmer Decl. ¶ 11, n.4.

analyses and data compilations of trust account-related materials.  *Id.*  It also has performed

work to (1) aggregate historical electronic transaction data in such a way that it can be

compared to a control source (*i.e.,* contemporaneous account statements produced for, or by,

BIA and/or OST) and (2) test the data to ensure that aggregate fund balances roll forward

appropriately across reporting periods and from one system to another.  *Id.*  The ultimate goal of

this work is to compile transaction records and data from disparate historical systems into a

single, uniform dataset that will facilitate analyses and tests of transaction data and account

balances.  *Id.*  Further, in recognition of the fact that reconciling a single account transaction

may well exceed the amount of many transactions at issue, OHTA has used statistical sampling

methods to reach valid conclusions on the accuracy of land-based IIM accounts and to reduce

costs and time of reaching those conclusions.  *Id. ¶* 18.

       Since 2003, OHTA also has worked to develop a programmatic approach to tribal

accounting issues for tribes, including tribes that had not filed cases prior to December 2006.

*Id.* ¶ 17.  As one important project, OHTA entered into a Cooperative Agreement with ITMA in

2004.  *Id.*  ITMA is a national non-profit tribal consortium the membership of which is

comprised of sixty-five Indian tribes.  *See* Pl.'s Unopposed Mot. To Extend Temporary Stay of

Proceedings (August 7, 2007) at 2, ¶ 4, *Coeur D'Alene Tribe v. Kempthorne*, No. 06-02242

(D.D.C.).  ITMA's mission, among other things, includes providing a forum for tribal

consultation on trust related issues.  *Id*. at 2, ¶ 5.  OHTA has provided financial support under

the terms of the Cooperative Agreement that has enabled ITMA to hire accountants and other

experts to help seven of its member tribes (who ITMA selected) to participate in this Project to

better understand their TRP results and then work with OHTA to develop a methodology that

aims to produce information to resolve any still-disputed tribal account balances.  *See* Swimmer

Decl. ¶ 17.  To date, the Project has produced a draft methodology that proposes to test

disbursements, evaluate investments and assess the completeness of tribal accounts.  *Id.*

       **B.**       **Trust Reform Regulatory Initiative.**

       Moreover, beginning in 2004, Interior also began to consult with tribes on the

development of regulations intended to establish an administrative agency process for resolving

trust account holder questions or concerns about their trust funds accountings.  *Id.* ¶ 19.  Interior

first described the concepts of this draft regulation in a September 2004 letter to the leaders of

federally-recognized tribes.  *Id.*  Interior received written comments from only four tribes in

response; all of which requested more specific information on this proposal.  *Id.*  On December

27, 2005, and July 7, 2006, Interior shared copies of the preliminary draft of the regulatory

language with the leaders of federally-recognized tribes as well as other organizations in Indian

Country, again seeking comments and recommendations.  *Id.*  Interior also presented those

preliminary drafts to - and sought comments from - tribes at three tribal consultation meetings:

in Albuquerque, New Mexico, on February 14, 2006; in Portland, Oregon, on August 15, 2006;

and in Albuquerque on August 17, 2006.  *Id.*

15

IV.    **Issues and Considerations to be Addressed to Complete the Accountings Owed to the Tribes**

As stated above, if the Court grants Interior's remand and litigation stay requests, Interior will prepare and present an accounting plan that addresses the plaintiffs' requests for accountings of their trust funds and non-monetary trust assets, and fully articulates the agency's factual and legal determinations of its various tribal accounting duties under law. *Id.* ¶ 22. In particular, while producing this accounting plan, among considering other issues and questions, as set forth in the Swimmer Decl. ¶¶ 20-26, Interior will address and determine a slate of factors including, but not limited to, whether or how:

- prior accountings, reconciliation, auditing and reporting efforts by Interior, other government agencies and private accountants may be relied upon in the present accounting effort, particularly in avoiding duplicative efforts by Interior;

- to conduct a formal cost benefit analysis of the value of any further work;

- to determine accurate cash balances in tribal accounts, such as by analyses and tests (including but not limited to those that use statistical sampling methods) of the accuracy and completeness of the postings to accounts;

- to determine the types, quantity and quality of documents necessary for the analyses and tests of the accuracy and completeness of the postings to accounts;

- to present accounting information to each tribe and determine the degree of detail to provide for each transaction;

- to include other accounts in the accounting, such as tribal IIM accounts and closed accounts;

- to establish a starting and ending date for the tribal accountings, which may vary by tribe or account;

- to conduct and incorporate into its accountings a review and accounting of non-monetary assets, such as real property and natural resources;

- to sequence its accountings - such as by tribe, account type, time period, sample basis, revenue source, or pilot scale and full scale testing;

16

- to solicit the input of tribes into accounting issues raised by tribes and the exceptions they have raised to accounting products provided to date;

- to incorporate ADR, other negotiation processes, and exceptions to any general rules for tribal accountings into its plan and process for administratively completing accountings;

- to allocate its budget among settlement efforts, litigation support, and formal tribal accountings, as well as between tribal and IIM work;

- to promulgate a formal rule to cover some or all of these matters, including an administrative appeal process;

- to address prior reports criticizing Interior's trust asset management and accounting;

- other applicable law, such as the Indian Claims Commission Act, the Interior appropriations riders and acts and many aspects of Title 25 of the United States Code regarding trust asset management, affects the determination of what accounting is owed;

- a tribe's response or failure to respond to the TRP affects its claim to any further accounting; and

- to exercise its discretion as to other aspects of the accounting to the extent permitted by law.

Additionally, in the tribal accounting plan, Interior will analyze and evaluate the similarities and differences between IIM accountings and those that have been and will be performed for tribal accounts. *Id.* ¶ 23. In conducting this analysis and evaluation, Interior will examine closely all of the relevant trust fund and non-monetary trust resource characteristics of the tribes. *Id.* Unlike the IIM account holders, the tribes with trust fund accounts were provided the results of the TRP which included, among other things, a statement of account balances as of a given date and an accompanying request to verify the accuracy of that stated balance. *Id.*

In contrast to the IIM accountings, tribal accountings implicate the Government-to-Government relationship that exists between the federal government and each individual tribe.

17

*Id.* ¶ 24.  The Indian Reorganization Act of 1934 (c. 576, 48 Stat. 984, *codified as amended at* 25 U.S.C. §§ 461 *et seq*.) and other laws have given tribes a great deal of autonomy over the management of their trust assets.  *Id.*  Some tribes have existed continuously as sovereign entities since time immemorial, and have trust assets dating back to the nineteenth century; others have been federally-recognized only in recent decades.  *Id.*  Some tribes have considerable assets, others very few; some tribes have only a single trust account, consisting perhaps of a judgment fund, while others have multiple types of accounts, dating from different times and containing funds from different sources (such as timber or other natural resource revenues).  *Id.*  In addition, each tribe has a potentially different starting date for the historical accountings of each of its accounts, depending upon factors such as when that account was opened, the effect of the Indian Claims Commission Act, and whether any tribal rights to an accounting as to any specific tribal account have been extinguished through litigation.  *Id.*

As part of its tribal accounting plan, Interior will also review and address the tribes' non-monetary trust asset accounting claims.  *Id.* ¶ 26.  This review and determination requires Interior to consider and decide numerous factual issues.  *Id.*  For instance, some tribes have never had any land held in trust for them by the United States, while some tribes have land-based assets which are not now or, at various times, have not been under federal management and control but instead are or have been held and entirely managed by those tribes themselves.  *Id.*  Interior needs to determine the level of land-based or non-monetary asset accounting owed to those tribes in all of those situations.  *Id.*  Interior also needs to examine and determine the significance and impact, if any, of all of the already-existing accounting-related products that have been available to the tribes.  *Id.*

18

In preparing its tribal accounting plan, Interior will consider and decide whether and how to apply the accounting expertise that it has developed in the tribal trust litigation since 2002, and the insights that it has gained in its consultations with tribes in Indian Country on the regulatory initiative since 2004, among other factors. *Id.* ¶ 21. In doing so, Interior needs to provide due consideration to tribes' specifications of any defects they believe exist in any financial information Interior previously has provided to them (including, but not limited to, the TRP results, account statements and source documents). *Id.*

Further, the determination of what additional work to perform in the production of an historical accounting for a particular tribe must be made after careful analysis of all the relevant characteristics of a tribe. Each tribal nation has unique features. As a result, the features of the historical accountings for tribes may differ from tribe to tribe, although the production of all tribal accountings will be guided by the tribal accounting plan Interior intends to produce on remand.

## V.    Relief Requested in Plaintiffs' Various Complaints

A significant number of tribes with tribal trust fund accounts have filed suits against Interior, Treasury, and/or the United States regarding their trust funds and trust assets. There are presently 102 tribal trust accounting and trust management lawsuits pending in the Federal District Court for the District of Columbia, the Court of Federal Claims, and various Federal District Courts in Oklahoma.[9] There are twenty-eight different judges presiding over the 102

---

[9]    Specifically, of the 102 cases, 56 cases are in the Court of Federal Claims, 37 are in the Federal District Court for the District of Columbia, and nine are in various Federal District Courts in Oklahoma. *See, e.g.*, Exh. 1, Unopposed Motion for Extension of Time to File Remand Motion, Docket No. 23, *Confederated Tribes of the Goshute Reservation v. Kempthorne*, (Civ. No. 06-cv-01902).

cases. Additionally, in two of the thirty-seven cases filed here in the District of Columbia, two groups of named tribes seek class action status to represent over 250 tribes. *See Nez Perce Tribe, et al., v. Kempthorne*, (D.D.C. No. 06-cv-02239); *Te-Moak Tribe of Western Shoshone Indians v. Kempthorne*, (D.D.C. No. 05-cv-02500). The thirty-seven cases pending before this Court involve fifty-four named tribal plaintiffs. *See* Swimmer Decl. at ¶ 8.

In the thirty-seven cases pending before this Court, the tribes make essentially similar allegations regarding the trust accounting and trust duties and responsibilities owed by the defendants. *Compare Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 16, and *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 24, with *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶¶ 6-14; 19-21. While each of these tribal suits pleads diverse facts, each and every plaintiff requests this Court to declare that the tribe has not received "complete" accountings of its tribal trust accounts. *See, e.g.*, *Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 37-38; *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 30; *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶ 34. The tribes also are unanimous in asking this Court to define the required accounting and order Interior and/or the Treasury to provide a complete accounting. *See, e.g., Compl. in Ak-Chin Cmty. v. Kempthorne* (Civ. No. 06-cv-02245) ¶ 42; *Compl. in Confederated Tribes of the Goshute Reservation v. Kempthorne* (Civ. No. 06-cv-01902) ¶ 34; *Compl. of The Osage Tribe of Indians of Oklahoma v. Kempthorne* (Civ. No. 04-cv-00283) ¶ 38.

20

## ARGUMENT

As set forth below, this Court has authority to grant defendants' remand motion based on application of the primary jurisdiction doctrine, which allows an agency to resolve issues within the agency's expertise before they are adjudicated.  Here, the presentation of an historical accounting plan setting forth the complicated factual, technical, fiscal and policy matters that must be decided to conduct an historical accounting of tribal trust accounts does not fall within the conventional experience of courts, requires application of Interior's expertise, and, in enabling Interior to craft an overarching programmatic approach, lessens the potential for inconsistent conflicting outcomes.

Another similar though distinct basis upon which this Court can grant a remand is the Court's equitable authority.  Good cause exists to hold these cases in abeyance while Interior prepares to present its plan detailing the scope of historical tribal accountings.  As explained more fully below, applicable precedent fully supports granting an agency's request for a voluntary remand when the agency's reasons for seeking the remand are "substantial and legitimate," when the agency seeks a remand to reconsider a prior action or decision, or when intervening events prompt the agency to seek to revisit or reconsider a prior action or decision in light of those events.  Under these factual circumstances, the appropriate course is for this Court to grant defendants' motion for a remand to Interior so that it may present its historical accounting plan for tribal trust accounts.

21

I.    **THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE
INTERIOR AND STAY THIS LITIGATION BASED ON APPLICATION
OF THE PRIMARY JURISDICTION DOCTRINE.**

Under the primary jurisdiction doctrine, a Court can remand an issue to the expert agency

to decide the matter in the first instance.  Plaintiffs have requested that this Court order

defendants to provide them with full and complete accountings for their tribal trust fund

accounts.  *See supra*.  The first step in providing a full and complete accounting is the

preparation of a historical accounting plan detailing how the accountings should take place.

Defendants request a remand so that Interior can provide this Court and plaintiffs with just such

a historical tribal accounting plan.  As detailed throughout the Swimmer Declaration, in crafting

a plan capable of guiding accountings for the unique situations of all tribal trust accounts,

Interior must make numerous factual, technical, fiscal, legal and policy determinations.  *See

generally* Swimmer Decl.  To the extent that the expertise required to make these determinations

lies within the specialized abilities of the agency, providing Interior the opportunity to craft a

systematic and programmatic approach, lessens the potential for inconsistent conflicting

outcomes given that twenty-eight judges are handling these cases.  The Court should remand to

Interior and stay the litigation based on the primary jurisdiction doctrine.

The primary jurisdiction doctrine is a "common law doctrine used to coordinate

administrative and judicial decisionmaking." *Red Lake Band of Chippewa Indians v. Barlow*,

846 F.2d 474, 476 (8th Cir. 1988) (case involving tribe's claims that Interior had not given

suitable accounting of trust funds remanded to Interior on basis of primary jurisdiction doctrine).

It "comes into play whenever enforcement of [a] claim requires the resolution of issues which,

under a regulatory scheme, have been placed within the special competence of an administrative

22

body." *United States v. Western Pacific R.R.*, 352 U.S. 59, 64 (1956) (*Western Pacific*);  *see also*

*Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (recognizing that primary jurisdiction applies to

claims "contain[ing] some issue within the special competence of an administrative agency");

*Brawner Building, Inc. v. Shehyn*, 442 F.2d 847, 856 (D.C. Cir. 1971) (same).

Although no fixed formula exists for its application, "the question is whether the reasons

for the existence of the [primary jurisdiction] doctrine are present and whether the purposes it

serves will be aided by its application in the particular litigation." *Western Pacific*, 352 U.S. at

64.  "The primary jurisdiction doctrine is premised on a desire for uniform outcomes and on the

inherent advantage in allowing an agency . . . to apply its expert judgment to the issues in

dispute." *Total Telecommunications Services, Inc. v. AT & T,* 919 F. Supp. 472, 478 (D.D.C.

1996), *aff'd,* 99 F.3d 448 (D.C. Cir. 1996).  Primary jurisdiction "is concerned with promoting

proper relationships between the courts and administrative agencies charged with particular

regulatory duties." *Western Pacific*, 352 U.S. at 63.  The posture of a suit - such as these thirty-

seven cases - as a declaratory judgment "strengthen[s] the case for primary jurisdiction" because

federal declaratory judgments "are not to be used to preempt and prejudge issues that are

committed for initial decision to an administrative body." *Allnet Communications Service Inc. v.*

*National Exchange Carrier Ass'n.,* 965 F.2d 1118, 1121 (D.C. Cir. 1992) (quotation marks and

internal citations omitted).

Under the doctrine, a court should refer a matter to an administrative agency for

resolution, "even if the matter is otherwise properly before the court, if it appears that the matter

involves technical or policy considerations which are beyond the court's ordinary competence

and within the agency's particular field of expertise." *Himmelman v. MCI Commc'n Corp.*, 104

23

F. Supp. 2d 1, 3-5 (D.D.C. 2000) (quoting *MCI Commc'n Corp. v. AT&T*, 496 F.2d 214, 220 (3d

Cir. 1974) (quotation marks and citation omitted)); *see also Allnet Commc'n Service, Inc.,* 965

F.2d at 1120 ("Expertise, of course, is not merely technical but extends to the policy judgments

needed to implement an agency's mandate."); *American Ass'n of Cruise Passengers v. Cunard

Line Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir. 1994).  Remand to an agency is appropriate where "a

prior agency adjudication of [the dispute] will be a material aid in ultimately deciding [the

issue]."  *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305 (1973).

    The courts traditionally have considered four factors in determining whether to apply the

primary jurisdiction doctrine whether: (1) the question at issue is within the conventional

expertise of judges; (2) the question at issue lies particularly within the agency's discretion or

requires the exercise of agency expertise; (3) there exists a substantial danger of inconsistent

rulings; and (4) a prior application to the agency has been made.  *See Total Telecommunications,*

919 F. Supp. at 478 (citing *AT&T v. MCI,* 837 F. Supp. 13, 16 (D.D.C. 1993)).  The fourth factor

– whether a prior application to the agency has been made – is essentially inapplicable to the

situation here because none of the tribes have alleged they requested an accounting from Interior

prior to filing the instant suits (or, more importantly, that Interior denied them a previously

requested accounting).  Based on application of the three applicable factors, the Court should

remand to Interior for preparation of a tribal historical accounting plan and stay this litigation

during the pendency of the remand.

A.    **Preparation of an Historical Accounting Plan Raises Issues of Fact Not Within the Conventional Experience of Courts.**

As to the first of the four elements of primary jurisdiction, the doctrine emphasizes that the court should defer to the appropriate specialized agency in cases that raise "issues of fact not within the conventional experience of judges." *Himmelman,* 104 F. Supp. 2d at 4 (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)). The issues of fact pertinent here arise largely from Interior's trusteeship of and responsibility to account for, funds held in trust by the United States for the benefit of an Indian tribe pursuant to federal law, and the 1994 Trust Fund Reform Act, in particular. For over a century, Interior has developed and implemented its own policies, regulations, specialized business systems and forms for handling funds and maintaining its records of account, under varied statutory and treaty-based mandates. *See* Swimmer Decl. ¶ 5 (generally discussing the historical and current systems for tribal trust fund accounting throughout the years). The many technical and intricate questions regarding the parsing and organization of Interior's accounting records are not within the conventional experience of courts. Interior is in a better position to distill the facts and circumstances regarding trust funds management presented in these cases, such as ascertaining ownership of particular accounts and interpreting Interior's forms and records. *See* Swimmer Decl. ¶ 20-26 (discussing other factors to be taken into account while setting forth a historical tribal accounting plan).

The Court also should delay forging ahead in these cases when there is a strong likelihood that agency action may simplify a complex fact pattern. *See Rohr Indus. Inc. v. Washington Metro. Area Transit Auth.*, 720 F.2d 1319, 1325 (D.C. Cir. 1983). This proposition is well established even in the trust accounting context, where, for example, the Indian Claims

25

Commission adopted a procedure in adjudicating accounting claims filed by Tribes that

obligated the government to compile an accounting after a Tribe's filing of a petition, but prior

to judicial review.  *See Sioux Tribe v. United States*, 12 Ind. Cl. Comm. 541, 549-50 (1963)

(Exh. 1); *American Indians Residing On Maricopa-Ak Chin Reservation v. U. S.,* 667 F.2d 980,

1002 n.62 (Ct. Cl. 1981).  Thus, the fact that preparation of a historical tribal accounting plan is

outside the conventional experience of courts weighs in favor of applying the doctrine here.

**B.    Preparation of a Tribal Historical Accounting Plan Requires the Expertise of Interior.**

The second factor - whether the question at issue lies particularly within the agency's

discretion or requires the exercise of agency expertise - conclusively applies in these cases

because the 1994 Trust Fund Reform Act plainly vests responsibility for providing an accounting

for Indian tribes with Interior.  *See* 25 U.S.C. § 4011(a).  It is settled that the Act's text "offers

little help in defining the accounting's scope."  *Cobell v. Norton*, 428 F.3d 1070, 1074 (D.C. Cir

2005) ("Cobell XVII").  The accounting "require[s] subject-matter expertise and judgment about

the allocation of scarce resources" that is best left to the discretion of administrators.  *Id*.  The

same is true for setting forth the scope of the historical tribal trust accountings.  Here, Interior is

the actor with primary responsibility for "'work[ing] out compliance' with the broad statutory

mandate."  *Id.* at 1076 (citation omitted).  Accordingly, Interior should determine and then set

forth the scope of the historical tribal accountings within its historical tribal trust accounting

plan.

Interior is expressly charged under the 1994 Trust Fund Reform Act in particular with

weighing a host of technical and policy considerations regarding the discharge of its trust

accounting duties that call upon its expertise.  For example, Interior can best determine the costs

26

and benefits of performing a wide range of accounting tasks for a host of individual tribes with many overlapping similarities as well as differences. *See* Swimmer Decl. ¶ 22 & 26; *Cobell XVII*, 428 F.3d at 1076 (noting that because neither the congressional record nor common law trust precepts establish a definitive balance between exactitude and cost, this Court owes substantial deference to the scope of an accounting as devised by Interior). For example in properly drawing upon its expertise, Interior intends to consider statistical sampling along with other methods for determining the accuracy and completeness of tribal trust fund accounts as a component of its historical tribal accounting plan. *See* Swimmer Decl. ¶ 18; *see also Cobell XVII*, 428 F.3d at 1077-79 (holding that the use of "statistical sampling" by the Secretary in the context of an accounting for IIM accounts was an appropriate use of discretion by the agency). Thus, the fact that Interior has unique expertise provides definitive support for application of the doctrine.

### C.    Remand to Interior Appropriately Lessens the Potential for Inconsistent Outcomes.

The third factor also weighs in favor of a remand, because a substantial danger of inconsistent outcomes exist if the accounting issues are not remanded. This factor targets the possibility of this Court issuing a ruling on a matter requiring the weighing of competing policies before the agency charged with fulfilling a statutory mandate has itself completed its decisionmaking on the same matter. *See Atchison, Topeka & Santa Fe. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 821 (1973) ("A court should refrain from expressing a preliminary view on what national transportation policy permits, before the ICC expresses its view."); *but cf. Allnet Communication Service*, 965 F.2d at 1120 (concern relates to disparate courts resolving issues inconsistently). This sort of conflict between the role of the court and the agency has already

27

arisen in the related case of *Cobell v. Kempthorne*, where the Court of Appeals for the D.C.

Circuit reversed this Court's entry of an injunction on the basis, *inter alia*, that it wrongfully

"treated the character of the accounting as its domain . . . [and] erroneously displaced Interior as

the actor with primary responsibility for 'work[ing] out compliance with the broad statutory

mandate.'" *Cobell XVII*, 428 F.3d at 1076 (citations omitted). Likewise, "sound discretion may

require that the judicial tribunal wait until there is initial consideration by an agency." *Brawner*

*Building*, 442 F.2d at 855. Here, the plaintiffs would have the Court specify defendants'

historical accounting and other obligations. But, assuming arguendo that such claims are

properly before this Court, it would nevertheless be error for the Court to specify such duties

before Interior has first articulated its view as to the proper scope of historical accountings for

tribal trust funds and other assets, especially because the accountings may vary by tribe, account,

or other significant attribute. Further, the accountings should be coordinated by Interior through

one historical tribal accounting plan that considers and weighs the proper sequence of tasks

necessary to perform accountings for the plaintiffs and other tribes, all within the limited budgets

allocated by Congress for that singular task, and to avoid court orders or other litigation

developments from placing inconsistent demands upon Interior. Application of the third factor

also results in this Court remanding to Interior.

## II.   THE COURT SHOULD REMAND TO THE DEPARTMENT OF THE INTERIOR AND STAY THIS LITIGATION BASED ON PRINCIPLES OF ADMINISTRATIVE LAW.

### A.   This Court Should Exercise Its Clear Authority to Remand to Interior.

Even outside the context of primary jurisdiction cases such as this one, this Court's

authority to grant a remand to the agency is well established. As the Supreme Court has noted:

> There is nothing . . . in the principles governing judicial review of administrative action, which precludes the court from giving an administrative body an opportunity to meet objections to its order by correcting irregularities in procedure, or supplying deficiencies in its record, or making additional findings where these are necessary, or supplying findings validly made in the place of those attacked as invalid. The application for remand in this instance was not on frivolous grounds or for any purpose that might be considered dilatory or vexatious.

*Ford Motor Co. v. NLRB*, 305 U.S. 364, 375 (1939). Moreover, when a reviewing court is unsure of an agency's reasoning, the proper course is to remand "to afford the agency an opportunity to set forth its view in a manner that would permit reasoned judicial review." *Checkosky v. SEC*, 23 F.3d 452, 462-63 (D.C. Cir. 1994) (separate opinion of Silberman, J.) ("[R]eviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision.").

The Court of Appeals for the Federal Circuit in *SKF USA INC. v. United States* has more recently identified a series of well-accepted grounds for granting a request for a voluntary remand:

> [T]he agency may seek a remand to reconsider its decision because of intervening events outside of the agency's control . . . [E]ven in the absence of intervening events, the agency may request a remand, without confessing error, to reconsider its previous position. Finally, . . . the agency may request a remand because it believes that its original decision was incorrect on the merits and it wishes to change the result.

*SKF USA INC. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (citing *Lawrence v. Chater*, 516 U.S. 163 (1996)). Moreover, while a court may refuse to grant a remand if the agency's request is frivolous or in bad faith, *see, e.g., Ford Motor Co.,* 305 U.S. at 375, if the agency's concern is "substantial and legitimate, a remand is usually appropriate." *SKF USA*

29

*INC.,* 254 F.3d at 1029.

> 1.    **Substantial and Legitimate Grounds Justify a Remand and Stay of This Litigation to Permit Interior to Prepare a Historical Accounting Plan for Tribal Trust Accounts.**

Defendants seek a voluntary remand to Interior so that Interior can present a written plan detailing its policies and process for the completion of historical tribal accountings. *See* Swimmer Decl. ¶¶ 20-26. Plaintiffs have brought claims requesting historical accountings of their tribal trust accounts and other assets. *See supra.* Interior proposes to provide plaintiffs with a major step towards historical tribal accountings, that is, a plan setting forth the scope of such historical tribal accountings. *See* Swimmer Decl. ¶¶ 20-26. In formulating that plan, Interior recognizes that it must consider accounting-related products previously provided to the tribes throughout the years, including the TRP materials provided in 1996 pursuant to the 1994 Trust Fund Reform Act. *Id.* ¶ 22. Further, Interior recognizes that it also must provide a full explanation of its decisions as to the scope of the historical accountings detailed in its forthcoming plan. *Id.* Interior has set forth its commitment to providing a plan to give historical accountings for tribal trust accounts. *Id.* ¶¶ 2 & 20. In these circumstances, it is in the best interests of all parties, the judicial process, and the Court to afford Interior the opportunity on remand to complete a plan to accomplish that historical accounting.

As noted above, it is incontrovertible that Congress has delegated to Interior the responsibility to account for tribal trust accounts. *See* 25 U.S.C. §§ 162a(d), 4011 & 4044. As such, Interior is "the actor with primary responsibility for 'work[ing] out compliance with the broad statutory mandate'" of the 1994 Trust Fund Reform Act, *see Cobell XVII*, 428 F.3d at 1076 (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004)), and

Interior is the entity with the technical, factual, fiscal and policy knowledge needed to prepare and present an historical tribal trust accounting plan. Interior has set forth policies and intra-agency guidance, and has developed expert understanding of the various accounting systems used throughout the years for tribal trust accounts, as well as of the records they generated. Defendants seek a remand at this time so that Interior can apply the significant information and expertise that it has obtained as the result of its work over the past several years on the tribal and IIM accounting fronts. *See* Swimmer Decl. ¶ 21 (discussing Interior seeking a remand so it can apply the tribal accounting expertise it has developed as the result of its 2002-06 accounting-related work with the earliest tribal trust plaintiffs, the insights gained from its 2004-06 consultations on the Regulatory Initiative and the other factors described in the declaration). The resolution of disputes with tribes over historic trust account balances and other accounting-related claims is a complex, multi-faceted endeavor and does not have easy solutions. *See* Swimmer Decl. ¶¶ 20-26 (discussing the various technical, policy, fiscal and legal decisions that must be made in setting forth a historical tribal trust accounting plan). This Court should permit Interior to explain how it intends to comply with its broad statutory mandate in its historical accounting plan for tribes.

In addition, the 1994 Trust Fund Reform Act makes clear that Congress intended for Interior to have the opportunity to undertake additional accounting work in response to a tribe's objections to a TRP. *See* 25 U.S.C. § 4044(3) (specifying that the Secretary "will undertake to resolve the dispute" over the balance of the account holder's account as reconciled in the TRPs). With regard to the tribes in these cases, Interior has not yet had an opportunity to complete an administrative process as contemplated in the 1994 Trust Fund Reform Act to address the

seventeen tribal plaintiffs who disputed their account balances.[10]  *See* Swimmer Decl. ¶ 8.  Nor has Interior set forth an overarching historical tribal accounting plan to guide accountings for other time periods for all tribes.  Interior intends to address how a tribe's response to the TRP may affect its claims to further accounting work as one part of its historical accounting plan.  The requested remand will allow the agency to "undertake to resolve" those disputed account balances and any other criticisms or exceptions to its accounting-related work to date, by preparing an historical accounting plan for tribal accounts for these plaintiffs and all tribes.

Congress has also expressed a strong preference for the negotiated settlement of tribal trust accounting disputes, as evidenced by legislation that for several years extended the statute of limitations applicable to TRP disputes, with the aim of encouraging Interior and tribes to negotiate settlements of those claims in lieu of litigation.  *See* The Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-153, 116 Stat. 79 (2002), as amended Pub. L. No. No. 109-158, 119 Stat. 2954 (2005) (codified at 25 U.S.C. § 4044 note).  In light of Congressional policy to encourage settlement, Interior thus initially organized its tribal historical accounting work to support settlement negotiations with tribes in a case-by-case basis.  *See* Swimmer Decl. ¶ 16; *see also SBC Communications Inc. v. F.C.C.*, 138 F.3d 410, 421 (D.C. Cir. 1998) (stating that it is appropriate for an agency "to make policy choices in small steps, and only as a case obliges it to.").  But, the increase in litigation demanding formal accountings, as of December 2006, is a development that warrants an opportunity for Interior to fully and publicly articulate its rationale as to the form and content of the historic accounting for tribes.

---

[10] In addition, of the tribal plaintiffs here, twenty-one never responded to their Interior about their TRP balances, *see* Swimmer Decl. ¶ 8.  Surely such circumstances weigh in favor of remand.

Importantly, as part of its programmatic approach to a historical tribal trust accounting, Interior intends to consider building in the flexibility to continue with ADR or negotiation processes. *See* Swimmer Decl. ¶ 22.

Third, it would benefit this Court and the parties to have a full administrative record prior to any adjudication of plaintiffs' claims on the merits. The administrative record for historical tribal trust accountings for these plaintiffs has not yet been fully developed. Hence, the Court cannot fully assess the reasonableness of Interior's decisions on these accounting claims until and unless Interior has the opportunity to articulate the bases of its decisions. Particularly since the record would benefit from additional articulation and action by Interior, the Court should not supplant Interior's role as the agency with primary responsibility for tribal trust fund accountings. This is particularly true with regard to making judgments about the allocation of scarce resources in striking a balance between exactitude and cost in defining the scope of the accounting. *Cobell XVII*, 428 F.3d at 1076 (citing *Heckler v. Cheney*, 470 U.S. 821, 831-32 (1985)). In short, it will save the parties and the Court time and expense if the Court remanded the action to Interior at this juncture so Interior may both apply its expertise and present a full record.

Finally, plaintiffs will not be prejudiced by a remand of the record considering the early stage of litigation at which this motion is filed. Litigation of the cases has not advanced significantly; dispositive motions and the administrative record have not yet been filed, and the Court has not yet established a briefing schedule in any of these cases. In fact, some of these cases have been administratively stayed and are proceeding on a settlement track. The likelihood of any prejudice is further diminished by the fact that, even in those cases where

plaintiffs have proposed a case management order to the Court, those plaintiffs have proposed

that the Court proceed in phases, with the first phase to result in a declaratory judgment from this

Court specifying defendants' accounting obligations. *See, e.g.,* Joint Report Pursuant to Fed. R.

Civ. P. 26(f) and Local Civil Rule 16.3 (Dkt. No. 12) at pp. 9-10, 16-17, *Ak-Chin Indian*

*Community v. Kempthorne*, (Civ. No. 06-cv-22245). The remand process presents a superior

alternative as a remand will permit Interior first to offer an administrative interpretation of its

accounting obligations.

> ### 2.    Remand is Appropriate to Allow Interior to Consider and Incorporate Additional Evidence Related to Interior's Accounting for Historical Periods.

In *Ethyl Corp.*, the court granted EPA's motion for voluntary remand of the

administrative record to allow the agency to consider new evidence and to make a new decision.

*Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993). That same rationale justifies a

remand in these cases, to the extent Interior's TRP reports (or other account statements) are

considered to be final agency actions currently reviewable under the Administrative Procedure

Act (APA).[1] Since furnishing the TRP reports and other account statements to tribes, Interior

has continually updated its body of historical accounting knowledge. *See* Swimmer Decl. ¶ 16

(explaining that in the settlement and ADR context, Interior has offered briefings to explain the

TRP data and results; examined the TRP Andersen work papers, as well as related document

collections; and prepared numerous accounting analyses and data compilations of trust account-

related materials for those cases); *see also id.* ¶¶ 19 & 21 (stating that Interior intends to consider

---

[1] Under the general review provision of the APA, the agency action challenged by plaintiffs
must be identified specifically and must be final agency action. *See* 5 U.S.C. § 704; *Lujan v.
National Wildlife Federation*, 497 U.S. 871, 882 (1990).

the insights gained from its 2004-06 consultations on the Regulatory Initiative during remand).

Moreover, in devising its historical tribal trust accounting plan, Interior will consider and decide

whether and how to apply the accounting expertise that it has developed previously while

negotiating with other tribal entities regarding trust claims. *Id*. ¶ 22. Remand is appropriate to

allow Interior to evaluate the lessons learned as the result of its various accounting efforts

implemented since 2003 while it assesses and defines the nature and extent of tribal accounting

work necessary during remand. *Id.* ¶¶ 18 & 21.

### 3.    Intervening Events Warrant Remand for Completion of an Accounting.

The passage of new legislation or the issuance of a new legal decision that affects the

validity of an agency action are examples of intervening events that will often require a remand

to provide the agency the opportunity to revisit its actions in light of the new developments. *See*

*SKF USA INC.*, 254 F.3d at 1028. In this case, the establishment of trust fund accounting

principles in the *Cobell v. Kempthorne* litigation, based on the 1994 Trust Fund Reform Act (a

statute that applies to accounting obligations for both tribal and IIM trust funds) is a significant

intervening event that warrantS remand to Interior.

Congress' actions with respect to tribal trust fund accounting since 1996 provide another

series of intervening events that warrant remand. As explained above, Congress in the 1994

Trust Fund Reform Act recognized that the TRP reports might not be the final historical

accounting product as it specified that Interior would propose means of resolving account

balance disputes. *See* 25 U.S.C. § 4044(3) (requiring, as part of its report to Congress, a

statement by Interior outlining what efforts Interior will undertake to resolve disputes with tribes

over the TRPs). Congress, however, has never adopted any such legislation. Instead, Congress

over the years encouraged Interior to pursue negotiated settlements of such tribal trust

accounting disputes, and even extended the statute of limitations as to the TRP disputes, with the

explicit aim of encouraging Interior and tribes to negotiate settlements of those claims in lieu of

litigation.  The Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-

153 (2002), read in the context of other legislative actions on tribal trust fund issues,

demonstrates Congress' strong preference that Interior take the initiative in pursuing an

administrative approach to resolving tribal trust fund accounting disputes.  *See* An Act to

Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-153, 116 Stat. 79

(codified at 25 U.S.C. § 4044 note).  That legislation, the effects of which expired on Dec. 31,

2006, constitutes a significant intervening event that provides further justification for the grant of

the requested remand at this time.

## CONCLUSION

For the foregoing reasons this Court should remand the issues in these cases to Interior

and stay these cases until Interior has completed its final accountings.

Respectfully submitted this 10th day of August 2007,

RONALD J. TENPAS
Acting Assistant Attorney General

*s/Maureen E. Rudolph*
MAUREEN E RUDOLPH
ANTHONY P. HOANG
MARTIN J. LALONDE
KEVIN J. LARSEN
United States Department of Justice
Environment and Natural Resources
Division
Natural Resources Division
P.O. Box 663
Washington, D.C.  20044-0663

36

Tel: (202) 305-0479
Tel: (202) 305-0241
Tel: (202) 305-0258
Fax: (202) 353-2021

JOHN H. MARTIN
United States Department of Justice
Natural Resources Section
1961 Stout Street, Eighth Floor
Denver, CO 80294
john.h.martin@usdoj.gov
TEL: (303) 844-1383
FAX: (303) 844-1350


Attorneys for Defendant

OF COUNSEL:

PAUL SMYTH
ELIZABETH BRANDON
THOMAS BARTMAN
GLADYS I. COJOCARI
SHANI N. WALKER
Office of the Solicitor
United States Department of the Interior
Washington, D.C.  20240

TERESA DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C.  20227

37